|  |  |
|---|---|
| Fontem US, LLC; OM Investment, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> Food and Drug Administration; Department of Health and Human Services; Martin A. Makary, in his official capacity as Commissioner of the Food and Drug Administration; Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department, <br><br> *Defendants*. | Civil Action No. 4:26-cv-322 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Fontem US, LLC ("Fontem") and OM Investment, LLC ("OM Investment") bring this suit against Defendants Food and Drug Administration ("FDA"); United States Department of Health and Human Services ("HHS"); Martin A. Makary, in his official capacity as Commissioner of FDA; and Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS (collectively, "Defendants" or "FDA") and allege as follows:

### PRELIMINARY STATEMENT

1. This case is the latest episode in FDA's failure to implement a workable regulatory regime for lower-risk tobacco and nicotine products.

2. Fontem is a leading manufacturer of nicotine pouch products, which provide a less harmful alternative to traditional cigarettes.

3. OM Investment, LLC (d/b/a Andy Food Store) sells Fontem's nicotine pouch products in its Fort Worth, Texas store.

1

4. As FDA has recognized, nicotine pouch products "can generally be a lower-risk alternative for adults who smoke cigarettes," and "switching completely from cigarettes to nicotine pouches may reduce exposure to many harmful chemicals found in cigarettes."[1]

5. In accordance with Congress's and FDA's requirements, Fontem (via a prior owner) submitted Premarket Tobacco Product Applications, known as PMTAs, to market certain of its Zone nicotine pouch products in May 2022.

6. By statute, FDA was required to adjudicate those applications by granting or denying them within 180 days of receiving them. *See* 21 U.S.C. § 387j(c)(1)(A) (FDA "shall" "issue an order" (i) "that the new product may be introduced . . . into interstate commerce," or (ii) "that the new product may not be introduced . . . into interstate commerce if the Secretary finds . . . that 1 or more grounds for denial specified [by statute] apply.").

7. Rather than comply with that deadline, FDA stalled. During that delay, Fontem invested resources, including both money and time, supplementing its PMTAs in response to FDA's ever-changing guidance on PMTA contents.

8. On December 16, 2025, almost four years after submission of Fontem's PMTAs—and well beyond the statutory 180-day deadline for granting or denying the PMTAs—FDA finally acted.

9. However, rather than grant or deny the PMTAs, as Congress commanded, FDA instead issued a letter "refusing to file" the PMTAs at all based on purportedly missing information.

10. But there is no third option to "refuse to file" a PMTA under the statute.

---

[1] FDA, *The Relative Risks of Tobacco Products* (Mar. 12, 2026), https://www.fda.gov/tobacco-products/health-effects-tobacco-use/relative-risks-tobacco-products.

11.     Rather, Congress required that, to deny marketing authorization in these circumstances, FDA must conclude that the product is not "appropriate for protection of the public health," *id.* § 387j(c)(2)(A), and must undertake a holistic, scientific assessment of each product, balancing any public health risks against the product's benefits, *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1219-21 (D.C. Cir. 2023).

12.     FDA could have established a more efficient procedure—Congress authorized FDA to promulgate *uniform* tobacco product standards, and reject PMTAs out of hand that failed to comply with them—but FDA declined to do so.  *Id.*

13.     As a result, FDA must complete this holistic public-health analysis, including assessing whether the risk of any "missing" information FDA desires outweighs the benefits of these less-harmful products.  *See id*.  Merely identifying "missing" information does not suffice under the statute.  *See id.*

14.     Yet FDA is trying to do exactly what the statute prohibits:  Short-circuit the required, holistic public health inquiry by refusing to *even file* a PMTA on grounds it is missing information.  FDA cannot avoid Congress's mandated balancing test by constructing its own preferred regime.

15.     Although FDA initially agreed to reconsider its December 16, 2025 decision, FDA issued a "Corrected" Refuse-to-File Letter on March 12, 2026 (collectively with the December 16, 2025 decision, the "Decision"), amending the bases for its decision but upholding its decision to refuse to file Fontem's PMTAs.

16.     FDA's Decision violates the governing statute and the Administrative Procedure Act ("APA") for other reasons, too.

3

17. In its Decision, FDA asserts that Fontem's PMTAs are missing information concerning the ingredients of *other* products used for bridging.

18. By advancing FDA's review of Fontem's scientific bridging rationale from the scientific review stage to the "refuse to file" stage, FDA violated its own regulations by requiring submission of information that the regulations do not in fact require, reversed its longstanding interpretation of its regulations and its policies for evaluating PMTAs, and, in doing so, failed to provide fair notice of the requirements that FDA ultimately imposed on Fontem.

19. FDA's approach here also violates the Tobacco Control Act ("TCA") and bedrock principles of administrative law, which do not allow FDA to ignore information that runs counter to its preferred outcome. Here, FDA had in its possession the very information that it asserts Fontem's PMTAs were missing. The agency could not blind itself to that information.

20. Finally, FDA's Decision, signed by the Deputy Director of the Office in the Center for Tobacco Products, was issued in violation of the Constitution's Appointments Clause. *See* U.S. Const. art. II., § 2, cl. 2.

21. Given that the Deputy Director indisputably exercises "significant authority" in refusing to file applications for tobacco products, the Deputy Director must be properly appointed as a federal Officer. *See Lucia v. SEC*, 585 U.S. 237, 241-45 (2018). He was not. Even though he purports to be exercising the powers of an Officer, the Deputy Director is a mere employee, and was unable to lawfully issue the Decision.

22. Plaintiffs bring this action to require Defendants to act in accordance with the governing statute, the APA, and the Constitution. They seek a stay, preliminary and permanent injunctive relief, as well as vacatur of FDA's Decision. Absent such relief, Plaintiffs will be

4

required to cease marketing the affected products, creating profound and irreparable harm for their businesses and their customers.

## PARTIES

23.     Plaintiff Fontem is a leading manufacturer, marketer, and distributor of branded consumer products, including nicotine pouch products.  Fontem is a nongovernmental North Carolina limited liability corporation.

24.     Plaintiff OM Investment is a Texas limited liability corporation that owns and operates Andy Food Store, an independent gas retailer and convenience store in Fort Worth, Texas. OM Investment's principal place of business is 3704 Granbury Road, Fort Worth, Texas 76109. OM Investment sells Fontem's products, including products subject to FDA's Decision, in its Andy Food Store.

25.     Defendant FDA is a United States federal agency.  Its headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver Spring, MD 20903.  Its governmental activities occur nationwide.

26.     Defendant Martin A. Makary, sued solely in his official capacity, is the Commissioner of the FDA.  In this capacity, Commissioner Makary has ultimate responsibility for activities at FDA, including the actions complained of herein.  His governmental activities occur nationwide.

27.     Defendant HHS is a department of the United States.  Its headquarters and principal place of business are at 200 Independence Ave, SW, Washington, DC 20201.  Its governmental activities occur nationwide.

28.     Defendant Robert F. Kennedy, Jr., sued solely in his official capacity, is Secretary of HHS.  In this capacity, Secretary Kennedy has ultimate responsibility for activities at HHS, including the actions complained of herein.  His governmental activities occur nationwide.

5

## JURISDICTION, VENUE, AND EXHAUSTION

29.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

30.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

31.     Plaintiffs' prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the APA, 5 U.S.C. §§ 701-06, and 28 U.S.C. § 1361.

32.     Venue is proper in this District because Plaintiff OM Investment has its principal place of business in this District and sells products subject to FDA's decision in its Andy Food Store, located in this District. In addition, significant volumes of products subject to the Decision are sold within this District.

33.     There are no requirements for exhaustion of administrative remedies applicable to FDA's Decision. In any case, Fontem has taken extensive steps to seek relief from FDA. Following receipt of FDA's initial letter on December 16, 2025, refusing to file Fontem's PMTAs, representatives from Fontem met with representatives from FDA on December 19, 2025, and provided FDA with a detailed chart, cross-referencing the pages of the PMTAs that contained the data FDA asserted was missing from the PMTAs. Subsequently, that same day, FDA informed Fontem that it would reconsider its determination, and would treat its prior letter as without effect while FDA completed its reconsideration review. On March 12, 2026, however, FDA issued its "corrected" refuse-to-file decision. FDA confirmed on March 13, 2026 that the Decision no longer remained under reconsideration by the agency.

6

## BACKGROUND

**A. Congress Grants FDA Carefully Circumscribed Power To Regulate Tobacco And Nicotine Products**

34. In 2009, Congress enacted the TCA to provide FDA authority to regulate "new" tobacco products through a premarket review process. 21 U.S.C. § 387j(a)-(b).

35. That process requires FDA to evaluate the scientific properties of a new tobacco product and its potential health impacts. *Id.*

36. Under the TCA, manufacturers of "new tobacco product[s]"—those not marketed as of 2007—are required to submit PMTAs to FDA for authorization to market their products. 21 U.S.C. § 387j(a)(2).

37. Initially, this process applied only to "cigarettes" and other enumerated tobacco products. *Id.* §387a(b).

38. Seven years after the TCA's passage, FDA deemed a broad swath of e-cigarettes and other products containing tobacco or nicotine derived from tobacco subject to the TCA's strictures. *See* Deeming Rule, 81 Fed. Reg. 28,974, 28,975 (May 10, 2016).

39. FDA subsequently received *6.5 million* applications, orders of magnitude more than the 6,800 it had anticipated.[2]

40. FDA immediately realized that this "unprecedented number" of applications created severe "challenges" for the agency to conduct the TCA's required scientific review.[3]

---

[2] *Transcript of Deemed Product Review: A Conversation with the Office of Science* at 17, FDA (June 11, 2021), https://www.fda.gov/media/150275/download?attachment.

[3] Mitch Zeller, *Perspective: FDA's Progress on Review of Tobacco Product Applications Submitted by the Sept. 9, 2020 Deadline* (Feb. 16, 2021), https://www.fda.gov/tobacco-products/ctp-newsroom/perspective-fdas-progress-review-tobacco-product-applications-submitted-sept-9-2020-deadline.

7

41.     Then, in 2022, Congress amended the TCA to allow FDA to regulate tobacco products containing nicotine from any source, including innovative, smoke-free products like non-tobacco nicotine pouches that are aimed at providing a less harmful alternative to adult smokers. *See* Consolidated Appropriations Act, 2022 Pub. Law. 117-103, § 111, 136 Stat. 49, 789 (2022).

42.     As a result, nicotine pouch products are now subject to the same PMTA regime as tobacco products.  21 U.S.C. § 387j(a)(2).

43.     Although Congress gave FDA the power to regulate tobacco and nicotine products, it did not give FDA unbridled discretion.

44.      Instead, Congress authorized FDA to take one of two actions following its review of a PMTA:  (1) "issue an order that the new product may be introduced or delivered for introduction into interstate commerce" because no Congressionally enumerated grounds for denial apply or (2) "issue an order that the new product may not be introduced or delivered for introduction into interstate commerce" because "1 or more grounds for denial" apply.  21 U.S.C. § 387j(c)(1)(A).

45.     In other words, the TCA allows FDA to only grant or deny the PMTA on the merits of the application.

46.     Congress also directed FDA as to *how* it was to make that decision.  Specifically, to deny a PMTA, FDA must find that: (A) there exists "a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health" ("public health provision"); (B) "the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of [21 U.S.C. §] 387f(e)" ("manufacturing provision"); (C) the product's proposed labeling is "false or misleading" ("labeling provision"); or (D) the product "is not shown to conform in all

8

respects to a tobacco product standard" under 21 U.S.C. § 387g ("tobacco standards provision"). 21 U.S.C. § 387j(c)(2)(A)-(D).

47. To determine whether one of those four bases to deny a PMTA exists, Congress carefully specified which types of information FDA should assess under each provision.

48. Under the labeling provision, FDA considers whether the proposed labeling is "false or misleading," which is rarely the case. 21 U.S.C. § 387j(c)(2)(C).

49. Under the manufacturing provision, Congress instructed FDA to regulate tobacco product manufacturing through the promulgation of regulations. 21 U.S.C. § 387f(e)(1)(A) (requiring Secretary to "prescribe regulations" for good manufacturing practices).

50. And Congress imposed a check on FDA's power by mandating various procedural safeguards, including an opportunity for oral hearings, an effective date that accounts for manufacturers' financial resources, and a four-year safe harbor for small manufacturers. *Id.* § 387f(e)(1)(B)(i)-(v).

51. To date, FDA has finalized no such regulations, despite Congress's command.

52. Under the tobacco product standard provision, should across-the-board product specifications for new tobacco products become necessary, Congress allowed FDA to adopt uniform product specifications.

53. This provision of the Act mandates notice-and-comment rulemaking. *Id.* § 387g(d)(1).

54. It also requires FDA to meet a wide range of form and content guidelines when issuing a standard. *Id.* § 387g(a)(4)(A)-(B).

9

55. Under this prong, FDA must consider certain evidence, including counter-evidence submitted by regulated parties. *Id.* § 387g(a)(3)(B). FDA has likewise failed to finalize any tobacco product standards.

56. Because FDA has not finalized manufacturing regulations or tobacco product standards (and proposed labeling is rarely false or misleading), FDA is left with the public health provision for PMTA review.

57. Under that provision, FDA must consider the totality of the product's effects on public health, specifically focused on the product's "risks and benefits to the population as a whole." *Id.* § 387j(c)(4).

58. This includes consideration of, among other things, "the increased or decreased likelihood that existing users of tobacco products will stop using such products" and "the increased or decreased likelihood that those who do not use tobacco products will start using such products." *Id.* § 387j(c)(4)(A)-(B); *see also Fontem*, 82 F.4th at 1215 (FDA must "undertake a holistic analysis directed at the overall effect a product will have on the public health.").

59. In order to deny a product authorization, the agency must explain how any purported deficiencies "relate to the overall public health consequences" of the products and "address the potential benefits of [the] products for the public at large." *Id.* at 1219.

60. To deny a PMTA under that standard, FDA must do much more than identify purportedly missing information in the PMTA; instead, FDA must explain *why* that missing information poses a serious enough risk "to outweigh the asserted benefits" of the new products. *Fontem*, 82 F.4th at 1219-21.

61.     Congress's limitations on FDA's authority make sense in light of the broader statutory scheme.  Congress did not grant FDA the power to ban cigarettes.  *See* 21 U.S.C. § 387g(d)(3).

62.     Given that cigarettes will remain on the market, Congress's direction to FDA to assess the public health benefits of new tobacco and nicotine products facilitates adult smokers' access to products that may allow them to transition to a less harmful alternative.

63.     Several other provisions reinforce that Congress aimed to get less harmful products into adult smokers' hands.

64.     First, Congress required that FDA "issue an order" either granting or denying a PMTA "in no event later than 180 days after the receipt" of the PMTA.  *Id.* § 387j(c)(1)(A).

65.     Second, Congress specified that FDA should provide "a statement informing the applicant of the measures required to remove" an application "from [a] deniable form" if FDA were to deny a PMTA.  *Id.* § 387j(c)(3).

66.      Third, Congress provided that judicial review of any denial of a PMTA would be in the court of appeals and that, to facilitate that review, FDA must include "a statement of the reasons for the issuance of such . . . order in the record of the proceedings held in connection with its issuance."  *Id.* § 387l(a)(2)(B), (e).

**B.     FDA's Regulations Circumvent The Review Scheme Mandated By Congress**

67.     Notwithstanding those limits on its authority, FDA's regulations purport to create additional actions it may take on a PMTA, allowing it to circumvent the review scheme mandated by Congress.

68.     Under its regulations, after an applicant submits a PMTA, FDA conducts *two* reviews before even purporting to reach the statutorily required process.

69. Specifically, FDA has asserted authority to "refuse to accept" or "refuse to file" a PMTA that it deems insufficient to merit scientific review, avoiding entirely the public health analysis that Congress commanded. 21 C.F.R. § 1114.27(a)(3), (b)(1); 86 Fed. Reg. 55,300, 55,315 (Oct. 5, 2021).

70. First, FDA makes an initial decision whether to "accept[]" a PMTA based on an "initial review" for compliance with "format requirements," "administrative[] complete[ness]," and whether the application "pertain[s] to a tobacco product." 21 C.F.R. §§ 1114.27(a)(1), 1105.10 (2025).

71. Second, after accepting a PMTA, FDA makes another, separate "threshold determination of whether" to "fil[e]" the PMTA. *Id.* § 1114.27(b)(1).

72. FDA assesses whether, in its view, the PMTA contains "sufficient information" to merit "substantive review." *Id.* § 1114.27(b)(1)(i)-(v).

73. If FDA refuses to file a PMTA, it issues a letter to the manufacturer "identifying the deficiencies, where practicable, that prevented FDA from filing the application." *Id.* § 1114.27(b)(2).

74. Only once FDA concludes that a PMTA has cleared its own first two hurdles does it proceed to the process dictated by Congress. *See* 21 U.S.C. § 387j(c)(1)(A).

**C.     Fontem's PMTAs For Its Nicotine Pouch Products**

75. Fontem markets a range of nicotine pouch products.

76. On May 14, 2022, prior owners of the PMTAs at issue submitted timely PMTAs for a certain subset of a line of nicotine pouch products, known as the Zone nicotine pouch products (only certain of which are subject to FDA's Decision).

77. Ownership of the intellectual property associated with those PMTAs was subsequently transferred to Fontem, along with ownership of the PMTAs themselves.

78. In the intervening years, Fontem amended its PMTAs as FDA's guidance on PMTA requirements changed. These amendments include submissions on November 15, 2024; April 30, 2025; May 9, 2025; September 4, 2025; and December 5, 2025.

79. These amendments have diligently and exhaustively provided the most up-to-date safety and packaging information for the relevant products as FDA's guidance has shifted and it has issued decisions for other PMTAs.

80. Fontem invested significant time and money to amend the PMTAs in response to changing FDA guidance.

**D. FDA Impermissibly Refuses To File Fontem's PMTAs**

81. On December 16, 2025, almost four years after the statutory 180-day deadline to either grant or deny marketing authorization, FDA instead issued a letter refusing to file Fontem's PMTAs.

82. Upon information and belief, FDA issued hundreds of these decisions on or around that same day, and there have been many reports of the decisions being clearly erroneous.

83. FDA's initial letter contained two bases for its decision.

84. First, FDA asserted that the PMTAs did "not include a full statement of the components, ingredients, additives," "lack[ed] adequate information on constituents, including harmful and potentially harmful constituents (HPHCs)," and lacked "stability" information.

85. Specifically, FDA acknowledged that the PMTAs provided "information on ingredients in the bulk filling powders," but concluded that the PMTAs did not "contain

13

information connecting the bulk powders to the new products" or "complete ingredient information for all new products."

86. Finally, FDA asserted Fontem did not provide HPHC or stability data for a subset of certain products subject to the PMTAs.

87. Second, FDA concluded the PMTAs did not "include a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and storage of, your finished tobacco products."

88. Immediately following receipt of FDA's letter, Fontem engaged in discussions with FDA.

89. Fontem explained that the information FDA asserted was "missing" from the PMTAs was, in fact, facially included.

90. So FDA had apparently just failed to review the PMTAs.

91. To aid FDA's review of the thousands of pages that FDA had demanded but apparently had not reviewed, on December 19, 2025, Fontem provided a detailed chart to FDA, cross-referencing the "missing" data with the exact pages where they could be located in the PMTAs.

92. That same day, FDA informed Fontem that it would reconsider its determination. Id.

93. On March 12, 2026, FDA issued its final, "corrected" refuse-to-file Decision.

94. After reviewing Fontem's chart showing that the "missing" information was actually contained in the PMTAs, FDA withdrew almost all of its purported "filing" deficiencies.

95. In their place, FDA offered a new deficiency.

14

96. By way of background, FDA asserts that a PMTA should include information concerning HPHC content, as well as content concerning stability (whether the product degrades during shelf-life). 21 C.F.R. § 1114.7(i)(1)(v), (i)(2)(vii).

97. Rather than requiring applicants to conduct costly HPHC and stability testing on every product subject to a PMTA, FDA specifically allows applicants to rely on data concerning HPHCs and stability obtained from other, similar products, known as "bridging" between products. *See, e.g.*, 21 C.F.R. § 1114.27(b)(ii); FDA, Guidance for Industry - Premarket Tobacco Product Applications for ENDS at 12, 46 (June 2019).

98. That is exactly what Fontem did: It provided a scientific rationale for "bridging" HPHC and stability data from other products, to the current products for which it sought authorization, identifying that, apart from nicotine levels, the formulations of the products it sought to bridge were "identical."

99. The Decision found this bridging rationale inadequate, because FDA asserted that the PMTAs were missing "ingredient lists" for the other products not subject to the PMTAs to which Fontem bridged its new products.

100. FDA "refused to file" the PMTAs, and commanded that Fontem (and distributors and retailers) may not manufacture, distribute, or sell these products.

**E. Refusing to File Fontem's PMTAs Will Irreparably Harm Plaintiffs And Those That Rely On Fontem's Products**

101. Absent immediate and permanent judicial relief, Plaintiffs will face irreversible harms.

102. Absent relief, Plaintiffs will be forced to cease selling the products subject to FDA's Decision, resulting in lost sales.

15

103. Plaintiffs will also incur irrecoverable compliance costs to conform to FDA's Decision, including costs to segregate, store, and dispose of the products covered by FDA's Decision.

104. Fontem will also be deprived of the benefit of the significant investments in money and time it made in support of the products and their marketing, including investments to amend the PMTAs, produce the products, and marketing expenditures.

105. Because sovereign immunity precludes recovery of monetary damages from FDA, 5 U.S.C. § 705, Plaintiffs cannot recover these losses.

106. Further, Fontem faces reputational harm absent a stay. If these products are forced from the market, Fontem will lose goodwill it has cultivated over almost a decade with its loyal customer base and trading partners, and Fontem's customers may switch to other competing products.

107. Relief would also present harm to product users, who rely upon these nicotine pouches as a safer alternative to combustible cigarettes. *See* FDA, *supra* n.1 (stating nicotine pouch products "can generally be a lower-risk alternative for adults who smoke cigarettes" and can help those smokers "reduce exposure to many harmful chemicals found in cigarettes").

## CLAIMS FOR RELIEF

**CLAIM I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW, IN VIOLATION
OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY AND THAT IS
ARBITRARY AND CAPRICIOUS
The Decision Violates the Tobacco Control Act and the Administrative Procedure
Act**

108. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

16

109.     The APA prohibits Defendants from acting in any way that is not in accordance with the law, or that is in excess of statutory jurisdiction or authority or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

110.     Upon receipt of a PMTA, the TCA specifies that the Secretary "shall" take one of two actions within 180 days:  (1) "issue an order that the new product may be introduced or delivered for introduction into interstate commerce" because no grounds for denial apply or (2) "issue an order that the new product may not be introduced or delivered for introduction into interstate commerce" because "1 or more grounds for denial" apply.  21 U.S.C. § 387j(c)(1)(A) *see also Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("[T]he word 'shall' imposes a mandatory command.").  In other words, the TCA allows FDA to only grant or deny PMTA on the merits of the application.

111.     In order to deny a PMTA, FDA must find that one of the four enumerated bases for denial is present.  21 U.S.C. § 387j(c)(1)(A), (2).  Those include:  (1) false or misleading labeling, *id.* § 387j(c)(2)(C); (2) failure to comply with a uniform manufacturing regulation, *id.* § 387j(c)(2)(B); and (3) failure to comply with a uniform product standard, *id.* § 387j(c)(2)(D).

112.     FDA has not finalized uniform manufacturing or tobacco product standards.

113.     FDA accordingly relies on the fourth basis in its decisions: whether marketing of the product is "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).

114.     That basis requires a "holistic public health analysis" of *both* the risks and benefits of the product to determine whether the product "will benefit the public as a whole."  *Fontem*, 82 F.4th at 1215 (citing 21 U.S.C. § 387j(c)(4)).

115.     Under that public health standard, FDA must do much more than, for instance, identify purportedly "missing" information in a PMTA that FDA wishes an applicant to submit;

17

instead, FDA must explain *why* that missing information poses a serious enough risk "to outweigh the asserted benefits" of the new products. *Id.* at 1219-21.

116. FDA cannot evade the required public health analysis by simply refusing to file Fontem's PMTAs. *See id.* at 1219-21 (reversing FDA's denial of marketing authorization on the basis of a purported failure to provide certain data because FDA failed to explain how many purported risks from that missing information outweighed the products' benefits); *id.* at 1222 (holding FDA had "ignore[d] Congress's detailed directives when denying tobacco marketing applications").

117. FDA's Decision is unlawful. The TCA does not allow FDA to refuse to file an application and thus circumvent Congress's required scientific analysis. *See* 21 U.S.C. § 387j(c)(1)(A); *cf. Li v. Jaddou*, No. 21-cv-883, 2022 WL 3588326, at *4 (W.D. Tex. Aug. 15, 2022) ("While USCIS has discretion to approve or deny an application, it is *required* to take action one way or another." (emphasis added))

118. By end-running the statute's required public health test, FDA has unlawfully "created a novel and fundamentally different . . . program," *Biden v. Nebraska*, 600 U.S. 477, 496 (2023), by adding an "unwritten" exception to an otherwise mandatory statutory requirement, *Ross v. Blake*, 578 U.S. 632, 635, 639 (2016); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 663-64 (2007) (explaining that "adding an additional criterion" to an exclusive statutory list "alters . . . [a] statutory command").

119. Because the Decision is an action not contemplated by the TCA, the Decision is not in accordance with law, in excess of statutory authority, and short of statutory right. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 663-64; 5 U.S.C. § 706(2)(A), (C); *see also Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 559 (D.C. Cir. 2025) (reiterating that an "agency cannot adopt

18

regulations . . . 'contrary to statute, nor exercise powers not delegated to it by Congress'"); *Rest. L. Ctr. v. U.S. Dep't of Labor*, 120 F.4th 163, 174-75, 177 (5th Cir. 2024) (holding agency rule that was inconsistent with statutory text to be "not in accordance with law" and arbitrary and capricious because it was "based on impermissible considerations and contrary to the statutory scheme enacted by Congress").

## CLAIM II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT THAT IS NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY AND THAT IS ARBITRARY AND CAPRICIOUS
### The Decision Violates the Tobacco Control Act and the Administrative Procedure Act

120. The foregoing paragraphs are incorporated by reference as if set forth in full herein..

121. The APA prohibits Defendants from acting in any way that is not in accordance with the law, or that is in excess of statutory jurisdiction or authority or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

122. The APA prohibits Defendants from acting in any way that is arbitrary or capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A).

123. The Decision is not in accordance with law, in excess of statutory authority, short of statutory right, contrary to law, and arbitrary and capricious multiple times over.

124. First, FDA violated its own regulations. In its Decision, FDA asserts that Fontem's PMTAs are missing information concerning *other* products' ingredients—information that is not required under FDA's regulation. *See* 21 C.F.R. § 1114.27(b)(1).

125. Instead, a refuse-to-file may (allegedly) issue based on a lack of "sufficient information required by [TCA] section 910(b)(1) . . . [and] § 1114.7 . . . to permit a substantive review of the application." 21 C.F.R. § 1114.27(b)(1).

19

126. But § 910(b)(1) and § 1114.7 do not require an applicant to provide all product-specific ingredients for *other* products. 21 U.S.C. § 387j(b)(1) (requiring "ingredients" for the "tobacco product" for which approval is sought); 21 C.F.R. § 1114.7(i)(1)(c) (same).

127. Second, FDA reversed its longstanding interpretation of its regulations and its policies for evaluating PMTAs which, once again, do not require complete "bridging" data at the refuse-to-file stage.

128. FDA has long interpreted its regulation to mean that, as long as an applicant provides *some* rationale for bridging to fill a "gap" in product-specific testing (for example, testing related to harmful or potentially harmful constituents (HPHCs) or stability), FDA will accept the applicant's PMTA as filed and evaluate the sufficiency of the bridging rationale *at the scientific review* stage. *See, e.g.*, *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 402 (5th Cir. 2024) (Haynes, J., dissenting) (explaining that FDA's public health analysis includes a "case-by-case assessment of each PMTA, including whether an applicant has presented sufficiently robust 'bridging' evidence justifying its use of other products' data"), *vacated and remanded on other grounds*, 604 U.S. 542 (2025).

129. Indeed, FDA has *filed and ultimately authorized* PMTAs in the exact circumstances here, where the applicant allegedly failed to "provide product composition information" for the other products to which the applicant sought to bridge, resulting in an allegedly "inadequate bridging rationale," because that "missing . . . information" concerning *other* products was outweighed by the totality of data in the PMTA. FDA, TPL for on Plus at 10-12 (Dec. 19, 2025), https://tinyurl.com/mpf94fj3.

130. Further reinforcing that FDA has never evaluated the *sufficiency* of bridging data at the refuse-to-file stage, FDA routinely permits applicants to submit *additional* bridging data at the scientific review stage, if needed. *See, e.g.*, *Fontem*, 82 F.4th at 1221-22.

131. Given FDA's longstanding policy of filing PMTAs if they contained *a* bridging rationale and then reviewing the rationale's *sufficiency* at the scientific review stage, FDA cannot refuse to file Fontem's PMTAs, which indisputably contain both a bridging rationale and data supporting bridging, based on the purported *insufficiency* of Fontem's bridging data to *support approval*, as it has done here.

132. Instead, if FDA wished to depart from its prior interpretation of the refuse-to-file regulation, FDA needed to explain its reversal and account for Fontem's and other applicants' reliance interests in FDA's prior regulatory approach. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *Emery Worldwide, A.C.F. Co. v. NLRB*, 966 F.2d 1003, 1005 (5th Cir. 1992) (An "agency is not allowed to change direction without sufficient explanation of what it is doing and why.").

133. FDA instead inexplicably reversed itself.

134. Third, FDA failed to provide fair notice of the requirements that it ultimately imposed on Fontem. *See R.J. Reynolds*, 65 F.4th at 189 ("To keep things fair, agencies must give notice of conduct the agency 'prohibits or requires.'").

135. On top of reversing its longstanding interpretation without prior notice, here, FDA had *already accepted* Fontem's PMTAs without requiring further bridging data.

136. *Before* reaching the "refuse-to-file" stage, FDA first decides whether to "accept" a PMTA based on whether it "contain[s] the information required" by FDA. 21 C.F.R. § 1114.27(a)(1)(ii), (b)(1).

137. FDA accepted Fontem's PMTA without raising any concerns about this supposedly missing data, and without claiming that the PMTA failed to contain "required" data. *See id.*

138. Fontem had no notice that FDA would suddenly find that *same* data *insufficient* later, particularly given that FDA's original letter did not even *allude* to any missing ingredient list for *other* products, either.

139. FDA also failed to explain these reversals. *Emery*, 966 F.2d at 1005.

140. Fourth, FDA unlawfully deprived Fontem of the very procedural protections that govern scientific review.

141. FDA's established practice during the scientific review stage is to issue a "deficiency letter" if it identifies information missing from a PMTA. *Fontem*, 82 F.4th at 1221; 86 Fed. Reg. at 55,381, 55,403.

142. That deficiency letter specifically identifies all information that FDA believes is missing and "indicat[es] [what] information would be sufficient for the agency" to approve the application. *Fontem*, 82 F.4th at 1221-22.

143. A manufacturer is then allowed to submit new, responsive information, while its PMTA remains under review. *Id.*

144. But by advancing its "bridging" analysis from the scientific review stage to the refuse-to-file stage, FDA denied Fontem *any* of the notice and opportunity to cure that would otherwise apply.

145. Providing such a cure would have been trivial, given that the required ingredient lists were *already on file* with FDA. *Infra* at ¶¶ X-X.

146. Fifth, FDA provided no explanation for allowing some applicants notice and opportunity to cure errors in bridging data *at the scientific review stage*, but then denying others

any notice and opportunity to cure the *same issues* at the refuse to file stage. *See Texas*, 829 F.3d at 423.

147. Sixth, FDA impermissibly ignored information that contradicted its preferred outcome.

148. In the Decision, FDA asserts that information regarding other products, to which Fontem sought to "bridge," was not provided and that Fontem had not provided certain data at all for other products.

149. But Fontem's PMTAs establish that Fontem sought to bridge for all of the products subject to the PMTA, which FDA ignored.

150. Similarly, the Decision ignores that FDA had in its possession the very information regarding the bridging products that FDA asserted was needed for scientific review, including in *other* PMTAs that Fontem explicitly cross-referenced and incorporated by reference in the subject PMTAs, as well as Tobacco Product Master Files that Fontem also referenced.

151. FDA could not ignore that information under the TCA or the APA.

152. FDA may only deny marketing authorization "if, upon the basis of the information submitted to the Secretary as part of the application ***and any other information before the Secretary with respect to such tobacco product***," one of the four statutory bases for denial is met. 21 U.S.C. § 387j(c)(2) (emphasis added).

153. FDA's review is not limited to data that is "part of the application." *Id.* Indeed, FDA routinely denies PMTAs based on data extrinsic to the PMTA at issue, but drawn from general FDA records.[4]

---

[4] *See, e.g.*, *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1137 (5th Cir. 2021) (FDA justifying denial based, in part, on its evidence of youth usage not in the PMTAs and referencing

23

154.     Against that background, FDA is not free to disregard data submitted to FDA by the applicant as part of a PMTA and expressly referenced by the applicant in its subject PMTA, simply by virtue of falling under a different PMTA file number.  *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016) (holding agency acted arbitrarily and capriciously when it "relied on a report prepared by a private expert outside the agency" to "bolster its conclusion" while "summarily dismiss[ing] concerns" brought by petitioner in its own comments before the agency). Rather, it was required to "base its decision[] on the entire record" and could not simply ignore portions of the record that run contrary to its preferred outcome.  *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 885 (D.C. Cir. 2004); *see also MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024) (noting that an agency cannot "bury its head in the sand and ignore data it d[oes] not want to consider" (quotation marks omitted)).

155.     For all these reasons, FDA's Decision was not in accordance with law, in excess of statutory authority, short of statutory right, contrary to law, and arbitrary and capricious.  5 U.S.C. § 706.

### CLAIM III: APPOINTMENTS CLAUSE VIOLATION
### The Decision, Denying Scientific Review, Violates the Appointments Clause

156.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

157.     The Appointments Clause of the United States Constitution provides that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . .  all [] Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest

---

FDA's review of other PMTAs); *Fontem*, 82 F.4th at 1216 (referencing FDA's practice of relying on "literature" regarding youth usage of e-cigarettes to justify denials).

the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

158. Government employees are officers, and thus subject to the Appointments Clause, when they exercise "significant authority pursuant to the laws of the United States." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025) (quoting *Lucia v. SEC*, 585 U.S. 237, 245 (2018)).

159. The Decision, which denies Fontem's ability to even have its PMTAs reviewed and requires Plaintiffs to remove the covered Zone products from the market, was signed by Benjamin Apelberg, Deputy Director for Regulatory Science, Office of Science, Center for Tobacco Products.

160. Apelberg, in his position as Deputy Director, carries out the functions of at least an inferior officer.

161. His authority to "enter a final decision" refusing to file a PMTA is a hallmark of significant authority. *See Lucia*, 585 U.S. at 246-48 (emphasizing "last-word capacity").

162. His "significant discretion" in carrying out "important functions," *id.* at 247-48, also shows significant authority.

163. The decision to refuse to file a PMTA is based on a "threshold determination of whether the application contains sufficient information to permit a substantive review." 21 C.F.R. § 1114.27(b)(1).

164. Whether an application contains "sufficient" information to deny a fulsome scientific review is not a simple ministerial task, requiring, on FDA's view, specialized scientific knowledge, purportedly, up to and including the adequacy of "bridging" data. FDA, *Process for*

25

*Implementing New Acceptance and Filing Reviews* at 2 (2022) (explaining that "filing review" concerns whether a PMTA contains "necessary" "scientific content").

165. Apelberg purports to retain discretion on whether "necessary" "scientific content" is present, including content *not* provided in FDA's regulations. *Id.*; *see also* 21 C.F.R. § 1114.27(b)(1) ("sufficient" information).

166. Apelberg also occupies a continuing position established by law.

167. Rather than serving on an occasional or temporary basis, Apelberg has held the Deputy Director position since at least 2021.[5]

168. And FDA created the Deputy Director position to carry into effect delegated authority of the Commissioner, including decisions on PMTAs.[6]

169. As such, Apelberg exercises at least the authority of an inferior officer. *Lucia*, 585 U.S. at 241-49 (considering officers' "last-word capacity," "significant discretion" to carry out "important functions," and "continuing position[s]"); *Space Exploration Tech. Corp. v. Nat. Lab. Relat. Bd*, 151 F.4th 761, 775 (5th Cir. 2025) (explaining "substantial authority" identifies "inferior officers").

170. Although Apelberg exercises at least the authority of an inferior officer, Apelberg has not been appointed in the Constitution's prescribed manner.

171. Apelberg has not been nominated by the President and confirmed by the Senate.

172. And, although an inferior officer may be appointed by the President or Head of a Department alone *if Congress allows*, U.S. Const. art. II § 2, cl. 2, no law vests the appointment of the Deputy Director in the President or Head of a Department.

---

[5] *Memorandum from Anne Radway to Benjamin J. Apelberg, FDA Office of Science* (May 27, 2021), https://tinyurl.com/3am4zjvs.

[6] *See* FDA, *supra* n.1.

173. Thus, to be properly appointed, Apelberg *must* be nominated by the President and confirmed by the Senate. He was not.

174. Indeed, Apelberg's position cannot even be ratified because Congress *never* passed a law authorizing the Deputy Director's appointment by the President or Secretary of Health and Human Services.

175. Apelberg is a mere employee, and therefore could not wield the "significant authority pursuant to the laws of the United States" necessary to issue the Decision. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

176. Accordingly, the Decision is invalid because it was not issued by a properly appointed officer of the United States.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a. A declaration pursuant to 28 U.S.C. § 2201 that the Decision is unlawful and in violation of the TCA, APA, and United States Constitution;

b. An order setting aside and vacating the Decision;

c. An administrative stay of the Decision to preserve the status quo and an emergency stay in the nature of a temporary restraining order and preliminary injunction, staying the Decision and prohibiting Defendants from taking enforcement action against Plaintiffs as to the products subject to the PMTAs, or on the basis of the Decision;

d. Temporary, preliminary, and permanent injunctive relief prohibiting Defendants from taking enforcement action against Plaintiffs as to the products subject to the

27

PMTAs, or on the basis of the Decision;

e.      An order awarding Plaintiffs their costs and attorneys' fees and expenses as allowed by law; and

f.      Such other and further relief as the Court deems just and proper.

Dated: March 17, 2026                Respectfully submitted,

*/s/ Scott C. Thomas*
Scott C. Thomas (admitted, TX Bar No. 24046964)
LATHAM & WATKINS LLP
100 Crescent Court, Suite 7084
Dallas, TX 75201
Tel: (713) 546-5400
Fax: (713) 546-5401
Email: scott.thomas@lw.com

Nicholas L. Schlossman (admitted, TX Bar No. 24093117)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com

Andrew D. Prins (D.C. Bar No. 998490) (pro hac vice forthcoming)
Cherish A. Drain (D.C. Bar No. 1656300) (pro hac vice forthcoming)
Halle H. Edwards (D.C. Bar No. 1780113) (pro hac vice forthcoming)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
      cherish.drain@lw.com
      halle.edwards@lw.com

*Attorneys for Plaintiffs*

28

29